# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs July 19, 2006

## STATE OF TENNESSEE v. ADAM SANDERS

**Direct Appeal from the Circuit Court for Marion County**
**No. 6354     Thomas W. Graham, Judge**

---

**No. M2005-02185-CCA-R3-CD - Filed December 6, 2006**

---

The defendant, Adam Sanders, was convicted by a Marion County Circuit Court jury of two counts of rape of a child, a Class A felony, one count of aggravated sexual battery, a Class B felony, and two counts of incest, a Class C felony. The trial court sentenced him to twenty years for each of the rape convictions, three years for each of the incest convictions, and eight years for the aggravated sexual battery conviction and ordered that the rape sentences be served consecutively to each other, for an effective sentence of forty years at 100% in the Department of Correction. Following the denial of his motion for a new trial, the defendant filed a timely appeal to this court in which he raises essentially four issues: (1) whether the trial court erred in denying his motion to suppress his statement to police; (2) whether the evidence was sufficient to sustain his convictions for rape of a child and incest; (3) whether the trial court erred in denying his motion for a new trial based on new evidence in support of his motion to suppress; and (4) whether the trial court erred in sentencing him to twenty years for each rape conviction and in ordering that the rape sentences be served consecutively. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and J.S. DANIEL, SR. J., joined.

Philip Condra, District Public Defender (at trial), and M. Keith Davis, Dunlap, Tennessee (at trial and on appeal), for the appellant, Adam Sanders.

Paul G. Summers, Attorney General and Reporter; C. Daniel Lins, Assistant Attorney General; James Michael Taylor, District Attorney General; and Sherry D. Gouger and Julia O. Sanders, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This case relates to the defendant's rape of his two biological daughters, D.S. and A.S.,[1] who were five and eight years old, respectively, when the acts at issue in this case occurred. Toward the end of May 2001, the victims' mother, Connie Sanders, who was separated from the defendant, allowed the girls to spend several days visiting the defendant at his small camper at the Kimball Campground. When the girls returned home, D.S. told her mother that the defendant had "played pussys" with them during their visit. Mrs. Sanders informed the police and an investigation ensued which resulted in the Marion County Grand Jury's return of a six-count indictment against the defendant on October 7, 2002, charging him with the rape, aggravated sexual battery, and incest of each child. The defendant was subsequently taken into custody on November 26, 2002, and in a November 27, 2002, videotaped statement to police admitted that he had touched D.S.'s vagina with his penis but denied that he had put his penis in her "hole." On June 2, 2003, the defendant filed a motion to suppress the statement.

## Suppression Hearing

The hearing on the defendant's motion to suppress was held on September 18, 2003, and January 12, 2004. Taffy Wilson, the only witness called by the State, testified at the September 18 hearing that she was a case manager with Child Protective Services and participated in Detective Keith Cox's November 27, 2002, interview with the defendant. On cross-examination, she stated that Detective Cox reviewed the waiver of rights form with the defendant and that the defendant said, before signing the waiver, "I guess I need a lawyer, huh?" or words to that effect.[2] She said she noticed that the defendant's speech was slurred but did not attribute it to drugs or alcohol because she knew he had been in jail before the interview began.[3] Finally, she agreed that after the interview, Detective Cox expressed some uncertainty about whether the Miranda warning had been given properly.

The thirty-nine-year-old defendant testified that he completed the eighth grade before dropping out of school. He claimed he could not read or write very well but, at defense counsel's request, read the waiver of rights form aloud without any apparent difficulty. When the trial court questioned whether he had understood the sentence he had just clearly read, "I do not want a lawyer at this time," the defendant replied:

Well, at that time, point in time he said I really didn't need a lawyer actually, because they said they's [sic] just trying to get some thing [sic] straight and when I

---

[1] In accordance with the policy of this court, we refer to the minor victims by their initials only.

[2] Although the witnesses and respective counsel thought the defendant said, "I guess I need a lawyer, huh?" the trial court stated that, after listening carefully to the videotape, he believed the defendant actually said, "I need a lawyer, don't I?" Having reviewed the videotape on appeal, we agree with the trial court's interpretation.

[3] The trial court noted at this point in the hearing that the defendant had been arrested at 9:45 a.m. on November 26, 2002, and had therefore been in jail for approximately one day before the interview took place.

asked him, do I need a lawyer, he should have stopped and got me a lawyer not [sic] matter what, instead of just s[i]tting there prosecuting me at the time.

The defendant testified that he could not recall whether Detective Cox or Taffy Wilson informed him that he had been charged with child rape. He acknowledged, however, that he had known that he was being held for a sexual abuse type of case because the sheriff had read the charges against him at the time of his arrest. The defendant testified that he had been arrested several times in the past on public drunkenness and methamphetamine charges but had never been questioned by a police officer in connection with those arrests. When questioned by defense counsel as to whether he was asking Detective Cox to get him a lawyer with his words, "I guess I need a lawyer, huh?" the defendant replied: "Yes, that's what I was doing. I's [sic] asking for a lawyer in that such a way, yes, sir, I was." The defendant testified that he was nervous at the time he signed the waiver and believed that Detective Cox was trying to help him.

On cross-examination, the defendant claimed that the day before the interview took place someone had put "confessing medicine" in his food in an effort to trick him. He said he knew he had been drugged because he "felt dizzy and . . . dazed and . . . sick at [his] stomach." He stated that he was no longer sick by the time he gave his statement but was still "hazing . . . from what was happening." He denied that he had been drinking or had taken any drugs other than aspirin. He acknowledged that he was familiar with the <u>Miranda</u> warning from television and that he knew he could have had a lawyer and did not have to make a statement. He reiterated, however, that he was frightened and confused and had not really understood what he was doing when he agreed to give a statement.

The suppression hearing was continued on January 12, 2004, in order for the defendant to present the testimony of Detective Keith Cox. Detective Cox testified that he was an investigator with the Marion County Sheriff's Department and that he interviewed the defendant on November 27, 2002, at the request of Department of Children's Services ("DCS") employee Taffy Wilson, who accompanied him to the Sheriff's Department for the interview. He said he recalled the defendant's asking, "I guess I need a lawyer, huh?" but did not interpret the question as a request for a lawyer. He stated he had not reviewed the videotape of the interview and could not remember the exact words he used in his answer to the defendant. However, he believed he told the defendant that he was not saying that he needed a lawyer.[4] Detective Cox acknowledged that a few weeks after the interview he approached defense counsel in juvenile court and told him that he knew he had "messed up" at that point in the interview. He explained he made the statement because, at the time, he thought he had told the defendant that he did not need a lawyer.

Detective Cox acknowledged that he did not ask the defendant if he was requesting a lawyer. He further acknowledged that he told the defendant that the waiver of rights was a "formality" and that he did not re-read the waiver of rights to the defendant after he made the reference about a lawyer. He conceded that his statement that the waiver of rights was "a formality" was "incorrect

---

[4]The videotape reveals that Detective Cox answered the defendant, "I didn't say you needed a lawyer."

and misleading" but said that "[i]t was not intended to be a misrepresentation." On cross-examination, he testified that he would have immediately stopped the interview had he understood the defendant to be requesting a lawyer.

At the conclusion of the hearing, the trial court found, among other things, that the defendant's question was not an unambiguous request for an attorney. Accordingly, on January 12, 2004, the trial court entered an order denying the defendant's motion to suppress.

### Trial

The first witness at the defendant's June 30-July 1, 2004, trial was the victims' mother, Connie Sanders, who testified that the defendant was her former husband and the father of A.S. and D.S. She said that in May 2001, she and the girls were living in South Pittsburg and the defendant was living several miles away in a small camper at the Kimball Campground. She stated that she allowed the girls to spend several days visiting the defendant at his camper at the end of May 2001, and when the girls returned home, D.S. told her something that caused her to immediately telephone the police. She said that a police officer responded to her home and then asked that she and the girls go to the police station, where DCS became involved.

Ms. Sanders testified that several months later, the defendant approached her and asked if he could see the children. She said she refused and asked him in turn how he could do what he had done to them. She stated that he first replied that the devil had made him do it and then said that God would forgive him and that he had done it because his girlfriend "wouldn't give him any." Ms. Sanders testified that the defendant also wrote her eight to ten letters in which he said he was sorry for what he had done and that he wanted them to be a family again. She said that in one letter, he requested that she speak to the district attorney to try to get him out of jail. On cross-examination, she acknowledged that the girls did not appear to be upset when they returned home from their visit with the defendant and that the defendant never told her exactly what he had done to them.

D.S. testified that she was born on October 9, 1995, and was currently eight years old. She agreed that the defendant did something that made her feel bad when she and her sister were visiting him at the Kimball Campground and recounted the following. She and her sister went to sleep with the defendant in the same bed, and, when she awoke, the defendant "was kind of doing sex to [her]." The defendant had pulled her underwear to the side, and she could feel his penis, or "winnie," which was "[h]ard," "in the middle of [her vagina] and [her] butt." D.S. said that her vagina or "poody" was "[h]urting," but denied that the defendant put his penis inside her vagina. She stated that she was lying on her side and the defendant was lying in the middle of the bed behind her. She testified that the defendant stopped "doing sex to [her]" when A.S. told him to stop because he was probably hurting her.

A.S. testified that she was born on March 28, 1993, and was currently eleven years old. She recalled that the defendant did several things that made her feel bad during the time she and D.S. visited him at the Kimball Campground. She said that the defendant first asked whether she wanted

a kiss or a French kiss, and when she chose French kiss, not knowing what it was, the defendant kissed her "tongue to tongue." She testified that on another occasion she was naked in the bathroom preparing to take a bath when the defendant came in, sat on the toilet, pulled his pants down to the floor, and told her to get on top of him. Referring to her vagina as her "front private part" and the defendant's penis as his "front private part," A.S. testified that she sat facing the defendant on his lap with her legs spread far apart and that he placed his penis between her legs and inside her vagina. She stated that the defendant's penis "was going back and forth" as the defendant moved her back and forth on top of him. She said the defendant was groaning like a bear and that a light blue substance came out of the top of his penis. She said that a portion of the substance ended up on her stomach and that she washed it off in the bathtub.

A.S. testified that at another time, she was sleeping in the bed with her sister and the defendant when she was awakened by the bed shaking and saw the defendant lying on top of D.S. Asked what the defendant was doing to D.S., she replied, "Putting his thing in between her legs and going back and forth." Later, A.S. testified that during that episode she saw the defendant "put his private part into [D.S.]'s private part."

A.S. testified that on another occasion the defendant licked her vagina, which hurt her. She said she was lying down at the time with her legs spread far apart. She also stated that, after that episode, the defendant told her not to tell anyone what he had done because they would both get into trouble. On cross-examination, A.S. acknowledged that in a June 2001 interview with a Child Advocacy Center investigator, Collette Young, she said nothing about the defendant's having done anything to her at the Kimball Campground.

Cindy Kilpatrick testified that she was employed by the Department of Human Services as a child protective investigator and on September 14, 2001, was sent by her supervisor to interview the defendant at the Southern Tennessee Medical Center in Winchester. She said the defendant told her that several months earlier when he was staying with his daughters at a camping area he had placed his penis on D.S.'s "poody" but did not "stick it in her hole." The defendant also told her that A.S. had told him to stop and that he had not done anything to A.S. at that time. Kilpatrick testified the defendant stated that he had not seen his children in a couple of months because he did not want to hurt them and that he was disclosing what he had done because he wanted to get help. On cross-examination, she acknowledged she learned that the defendant was in the hospital because he had attempted suicide.

Kathy Spada, a sexual assault nurse examiner employed at T.C. Thompson Children's Hospital, testified that she examined the victims on June 12, 2001. She said that the examinations for both victims were "essentially normal," with no signs of vaginal or anal injuries. She further testified that D.S.'s hymen was intact. She explained, however, that she would not expect to find evidence of injuries more than seventy-two hours beyond a rape and that an object would have to protrude past the hymen and into the vaginal vault in order to rupture the hymen.

Detective Keith Cox testified that on November 27, 2002, Taffy Wilson of the Department of Children's Services asked him to sit in on an interview with the defendant. He identified an excerpt from the interview, which was played before the jury and subsequently admitted as a trial exhibit. On cross-examination, Detective Cox acknowledged the defendant denied that he had sexual intercourse with D.S. and said that the only place he touched A.S. was on her leg.

The defendant elected not to testify and rested his case without presenting any proof. Count Two, which charged the defendant with the aggravated sexual battery of D.S., was dismissed at the end of the State's proof, and, following its deliberations, the jury convicted the defendant of the remaining five counts as charged in the indictment.

At the conclusion of the sentencing hearing, the trial court, noting the uncertainty in sentencing created by Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004), declined to apply any enhancement factors to the defendant's sentences. The defendant did not propose any mitigating factors, and the trial court did not find any applicable to the offenses. The court, therefore, sentenced the defendant as a Range I, standard offender to the presumptive sentences of twenty years for the Class A felony of child rape, eight years for the Class B felony of aggravated sexual battery, and three years for the Class C felony of incest. Finding Tennessee Code Annotated section 40-35-115(b)(5) applicable based on the circumstances surrounding the offenses, the trial court ordered that the two rape sentences be served consecutively, for an effective sentence of forty years.

## ANALYSIS

### I. Denial of Motion to Suppress Statement

The defendant contends that the trial court erred in denying his motion to suppress his videotaped statement, which he argues was obtained in violation of both his Fifth and Sixth Amendment rights to counsel. When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Moreover, the party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). Thus, the findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. However, the application of the law to the facts found by the trial court is a question of law and is reviewed *de novo*. See State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

A defendant's Sixth Amendment right to counsel attaches when the adversarial judicial process has begun. Michigan v. Jackson, 475 U.S. 625, 629, 106 S. Ct. 1404, 1407 (1986); Brewer v. Williams, 430 U.S. 387, 401, 97 S. Ct. 1232, 1240 (1977); State v. Rollins, 188 S.W.3d 553, 565-66 (Tenn. 2006). In Tennessee, the adversarial judicial process is initiated upon the filing of the

formal charge, which includes the arrest warrant, indictment, presentment, or the preliminary hearing in cases in which a warrant was not obtained prior to the defendant's arrest. See Rollins, 188 S.W.3d at 566; State v. Mitchell, 593 S.W.2d 280, 286 (Tenn. 1980); State v. Jackson, 889 S.W.2d 219, 222 (Tenn. Crim. App. 1993). Since the defendant's indictment was returned prior to his arrest, his Sixth Amendment right to counsel had attached at the time he gave his statement. "Once formal criminal proceedings begin, the Sixth Amendment renders inadmissible in the prosecution's case-in-chief statements 'deliberately elicited' from a defendant without an express waiver of the right to counsel." State v. Land, 34 S.W.3d 516, 523 (Tenn. Crim. App. 2000) (quoting Michigan v. Harvey, 494 U.S. 344, 348, 110 S. Ct. 1176, 1179 (1990)).

A criminal defendant also has a right to counsel that is encompassed within his Fifth Amendment right against self-incrimination. See Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966); State v. Huddleston, 924 S.W.2d 666, 669 (Tenn. 1996). Both the United States and Tennessee Constitutions protect a defendant from being compelled to give evidence against himself. See U.S. Const. amend. V; Tenn. Const. art. I, § 9. Thus, to be admissible at trial, a confession made while under custodial interrogation must be shown to have been freely and voluntarily made, after the defendant's knowing waiver of his constitutional right to remain silent and to have an attorney present during questioning. See Miranda, 384 U.S. at 444, 86 S. Ct. at 1612. In Rollins, which the State submitted as supplemental authority in this case, our supreme court applied Patterson v. Illinois, 487 U.S. 285, 108 S. Ct. 2389 (1988), to conclude that when a defendant is adequately informed of "'the dangers and disadvantages of self-representation'" by properly executed Miranda warnings, "his waiver of his Sixth Amendment right to counsel at such questioning is 'knowing and intelligent.'" 188 S.W.3d at 566 (quoting Patterson, 487 U.S. at 300, 108 S. Ct. at 2389).

When a suspect makes an unequivocal request for an attorney, all interrogation must cease unless the suspect himself initiates further conversation with the police. See Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 1884-85 (1981); State v. Stephenson, 878 S.W.2d 530, 545 (Tenn. 1994). However, an invocation of the right to counsel "'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" Davis v. United States, 512 U.S. 452, 459, 114 S. Ct. 2350, 2355 (1994) (quoting McNeil v. Wisconsin, 501 U.S. 171, 178, 111 S. Ct. 2204, 2209 (1991)). In other words, the suspect's request for an attorney must be stated "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Id. "If the suspect fails to make such an unambiguous statement, police may continue to question him without clarifying any equivocal requests for counsel." State v. Saylor, 117 S.W.3d 239, 246 (Tenn. 2003) (citing Huddleston, 924 S.W.2d at 670). Whether a suspect has made an unequivocal request for counsel is a question of fact to be determined by the trial court. State v. Farmer, 927 S.W.2d 582, 594 (Tenn. Crim. App. 1996).

The defendant contends that the evidence shows that he invoked his Fifth and Sixth Amendment rights by his refusal to sign the waiver of rights form. He further contends that the evidence preponderates against a finding that his waiver was voluntary, knowing, and intelligent.

-7-

In support, he cites, among other things, his request for legal advice from Detective Cox, his repeated refusal to sign the waiver of rights form, and Detective Cox's misleading reassurance that the waiver was just a formality. He argues that, at a minimum, Detective Cox should have realized that he was invoking his Fifth Amendment right to remain silent and should therefore have ceased the interrogation upon his refusal to sign the waiver. We respectfully disagree.

The videotape reveals that, before beginning any questioning, Detective Cox read the defendant his Miranda rights and asked if he understood those rights. The defendant replied, "I guess," and Detective Cox then asked if he could read. When the defendant answered that he read "fairly well," Detective Cox passed him the form and asked that he read it aloud. The defendant did not comply with that request but appeared to read the form silently to himself. After approximately sixteen seconds, the defendant looked up and asked, "I guess I need a lawyer, don't I?" At that point, the following exchange transpired:

> Detective Cox: I'm not saying you need a lawyer. Just, this is a formality. We have to read this to everybody before we talk to them, okay? We just need to clear some issues up from the past and in the present and, uh, we do this to everybody we talk to.

> Defendant: Well, I didn't touch my kids this time.

> Detective Cox: Well, we need to talk about that. That's why I'm here to talk to you. You need to prove your innocence, okay. If you're innocent that's what we're here to do. And we need to ask you questions pertaining to . . . uh . . . to the . . . uh . . . accusations, okay, and that's why we're here. Let me fill this out for you, okay. Just a second. [Pause while Detective Cox fills out form.] Mr. Sanders, I need you to sign your signature right there sir, okay, before we talk to you. [Passes form to the defendant.]

> Defendant: I don't want to sign nothing yet.

> Detective Cox: Uh . . .

> Defendant: I ain't going to sign nothing yet.

> Detective Cox: Just because you signed it -- you can stop talking to us at anytime. It's just a formality like I told you before.

> Defendant: [Looks at form again] This is just saying that I understand my rights.

> Detective Cox: Understand your rights, exactly.

> Defendant: I still . . . well . . .

Detective Cox:  If you want to stop talking at any time, you can do so, okay?  That just says that I have read you your rights and you understand your rights.  You want to clear your name up, right?  That's what we're here to do.

Defendant:  That's what I want to do.

The defendant then signed the waiver, and Detective Cox and DCS Investigator Taffy Wilson proceeded to question him about the prior statement he had given to Cindy Kilpatrick.

The evidence in this case does not preponderate against the trial court's findings that the defendant's statement was knowingly and voluntarily made after he had been given adequate Miranda warnings and signed a valid waiver of his right to remain silent or to have an attorney present during questioning.  As the defendant acknowledges in his brief, our supreme court concluded in Huddleston, 924 S.W.2d at 670, that a defendant's refusal to sign a waiver of rights form, accompanied by his statement, "I ain't signing nothing," did not constitute an unambiguous request for an attorney.  Our courts have also repeatedly found that questions similar to the defendant's, "I guess I need a lawyer, don't I?" do not constitute unambiguous requests for an attorney.  See, e.g., State v. James Robert Ledford, No. E1999-00917-CCA-R3-CD, 2000 WL 1211312, at *9 (Tenn. Crim. App. Aug. 28, 2000) (noting the number of cases in which this court has found that a defendant did not invoke his right to counsel by asking interviewing officers whether he needed a lawyer).

The defendant, who testified that he completed the eighth grade, claimed at the suppression hearing that he could not read very well but then proceeded to read the waiver of rights form aloud without any apparent difficulty.  He acknowledged that he read and signed the waiver before making his statement, that he was familiar with the Miranda warning, and that he knew he had the right to remain silent or to have a lawyer present during questioning.  He claimed that he was confused and scared at the time he signed the waiver and made his statement but denied that he was under the influence of alcohol or drugs.  He also acknowledged that neither Detective Cox nor Taffy Wilson threatened or coerced him into signing the statement.  We conclude, therefore, that the defendant made a knowing and valid waiver of both his Fifth and Sixth Amendment rights to counsel and, thus, that the trial court did not err in denying his motion to suppress his statement at trial.

## II.  Sufficiency of the Evidence

The defendant next challenges the sufficiency of the evidence for his rape and incest convictions.  Specifically, he argues that there was insufficient evidence to prove beyond a reasonable doubt that he sexually penetrated either of his daughters.  When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to

support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Rape of a child is the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a) (2003). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body . . . into the genital or anal openings of the victim's . . . body[.]" Id. § 39-13-501(7) (2003). "A person commits incest who engages in sexual penetration . . . with a person, knowing such person to be . . . [t]he person's natural . . . child[.]" Id. § 39-15-302(a)(1) (2003).

The defendant acknowledges that penetration of the outer folds of the vagina is sufficient to sustain a conviction for rape, see State v. Bowles, 52 S.W.3d 69, 74 (Tenn. 2001), but argues that "the record is completely void as to whether even this relatively slight degree of penetration occurred" in the case of D.S. We respectfully disagree. Although D.S. denied that the defendant had put his penis in her vagina, A.S. testified that she saw the defendant put his "private part" in D.S.'s "private part." Moreover, D.S. testified that she awoke to find that the defendant had pulled her underwear to the side and was "kind of doing sex" to her. She said that she could feel his penis, which was hard, "in the middle of her poody and her butt" and that her "poody," or vagina, was hurting. From this evidence, a rational trier of fact could have found beyond a reasonable doubt that the defendant sexually penetrated D.S. Accordingly, we conclude that the evidence is sufficient to sustain the defendant's convictions for the rape and incest of D.S.

-10-

We further conclude that the evidence is sufficient to sustain the defendant's convictions for the rape and incest of A.S. Citing, among other things, A.S.'s normal physical examination and the fact that she did not disclose the alleged abuse in her statement to Investigator Young, the defendant argues that A.S.'s trial testimony was insufficient to establish the element of sexual penetration. We, again, respectfully disagree. As the State points out, in State v. Elkins, 102 S.W.3d 578, 582-83 (Tenn. 2003), our supreme court concluded that a child rape victim's trial testimony, alone, was sufficient for a rational trier of fact to find the defendant guilty beyond a reasonable doubt of child rape. A.S. unequivocally testified that the defendant put his penis inside her vagina during the episode that occurred in the bathroom of the camper. By finding the defendant guilty of the rape and incest of A.S., the jury obviously accredited her testimony. The credibility of witnesses, as well as the weight and value to be accorded to the evidence, is within the province of the jury, and we will not second-guess the jury's determinations.

### III. Denial of Motion for New Trial

The defendant contends that the trial court erred in overruling his motion for a new trial "despite the introduction of new evidence that demonstrated that he did not make a knowing, intelligent and voluntary waiver of his constitutional rights." To be entitled to a new trial on the basis of newly discovered evidence, a defendant must show (1) that he or she used reasonable diligence in seeking the newly discovered evidence; (2) that the new evidence is material; and (3) that the new evidence will likely change the result of the trial. See State v. Nichols, 877 S.W.2d 722, 737 (Tenn. 1994). Whether to grant a new trial on the basis of newly discovered evidence lies within the sound discretion of the trial court. See State v. Caldwell, 977 S.W.2d 110, 117 (Tenn. Crim. App. 1997). Accordingly, we review this issue for an abuse of discretion. See State v. Meade, 942 S.W.2d 561, 565 (Tenn. Crim. App. 1996).

On August 9, 2005, the trial court held a combination hearing on the defendant's motion to suppress his statement, made in connection with a pending Grundy County case involving the same victims, and his motion for a new trial in the instant case. For the purposes of this appeal, the only pertinent new evidence the defendant introduced at the hearing was the testimony of Dr. David A. Solovey, a clinical psychologist originally hired by defense counsel in an effort to find mitigation evidence to present at the sentencing hearing.

Dr. Solovey testified that he met with the defendant on November 18, 2004, and administered a number of tests, including the Wechsler Adult Intelligence Scale Third Edition. He stated that the defendant was a "very submissive individual," with an overall full-scale IQ of 72, which placed him on the borderline between lower average intelligence and mild mental retardation. Dr. Solovey opined that, based on the test results, the defendant would have difficulty comprehending written or verbal information. He further opined that the defendant had been led to develop a level of trust in Detective Cox by the detective's "very kind and very gentle and very firm and authoritative" manner during the interview and had not fully understood that he was agreeing to waive his rights by signing the waiver. However, on cross-examination he acknowledged that the defendant was capable of understanding that he had a right to a lawyer and capable of making the decision to waive that right.

He further acknowledged that there was no evidence that the defendant had ever been treated for head injuries or brain damage, that he became more focused as the interview progressed, and that he did not appear to have been under the influence of drugs or alcohol during the interview.

In denying the motion for new trial, the trial court found, among other things, that nothing in Dr. Solovey's testimony would have altered its ruling on the motion to suppress. The trial court stated, in pertinent part:

> All right, I'm not persuaded that he did not truly understand[.] He made a pretty spirited defens[ive] argument similar to your argument himself. He was incensed that they would have pushed him to such degree and so forth, all of that argues against hi[s] inability to have understood as far as I'm concerned at the time. He was not intoxicated and, you know, from a strictly standpoint of what ended up benefitting or taking away from him, he made a mistake. There's no question about it. The case would have been better if he hadn't said anything from his standpoint, but the issue is whether or not he had the right to make that mistake or had the knowledge about which to make the mistake and talk about what happened and in my judgment nothing about Doctor Solovey's testimony changed my conclusion that he was not mistreated to the extent that he did not make a voluntary act.

We find no abuse of discretion in the trial court's ruling. We are not convinced that evidence that the defendant has a lower than average IQ, experiences difficulty comprehending written or verbal information, and is a submissive individual would lead to the suppression of his statement or otherwise would have affected the outcome in this case. Whether the defendant made a voluntary, knowing, and intelligent waiver of his Miranda rights depends "'upon the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused.'" Edwards, 451 U.S. at 482, 101 S. Ct. at 1884 (quoting Johnson v. Zerbst, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023 (1938)). The defendant testified that he read and signed the waiver of rights, was familiar with the Miranda warning, knew that he had the right to have counsel present for questioning, and was not under the influence of drugs or alcohol. There is also nothing in the record to show that counsel could not have requested that independent psychological testing be performed prior to trial or that he be given the specific results of any tests which may have been administered by the psychologists who determined the defendant's competency to stand trial. We, therefore, conclude that the defendant is not entitled to relief on the basis of this claim.

## IV. Sentencing

As his final issue, the defendant challenges the sentencing imposed by the trial court. He argues that consecutive sentencing is not warranted by the record and that the forty-year effective sentence results in an excessive punishment. He further argues that the presumptive twenty-year sentence that the trial court imposed for each rape conviction violates the amendment to Tennessee Code Annotated section 40-35-210(c), as well as the United States Supreme Court's holding in Blakely v. Washington.

When an accused challenges either the length or manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). However, this court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is predicated upon the witnesses' demeanor and appearance when testifying.

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210 (2003); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S .W.2d at 169. Thus, the defendant has the burden in this case of demonstrating that the trial court erred in its sentencing determinations.

## A. Consecutive Sentences

The only evidence introduced at the January 21, 2005, sentencing hearing was the defendant's presentence report. The presentence report reflects that the defendant had six prior misdemeanor convictions: two drug paraphernalia convictions; one conviction for driving with a suspended, cancelled, or revoked license; one conviction for public intoxication, and two DUI convictions. The report further reflects that the defendant had violated his probation on the drug paraphernalia convictions several times, including with his November 2002 arrest in the instant case, and that he had rape charges involving the same victims pending against him in Grundy County. In addition, the report reflects that the defendant admitted during his September 14, 2001, interview with DCS that he had had sexual intercourse with A.S. when she was six or seven years old. The report also states that A.S. revealed in her interview with forensic examiner Collette Young that the defendant had been having sexual intercourse with her for "a long time" and that he had started doing it to her when she was seven. Finally, the victims' mother reported that she and her daughters were "emotional" and that the victims had received some counseling through TennCare but had been

unable to complete it because the family's vehicle had broken down.  She said that the victims "seem like normal children now" and that she believed they were "glad this is over."

Tennessee Code Annotated section 40-35-115(b) provides that it is within the trial court's discretion to impose consecutive sentencing if it finds by a preponderance of the evidence that any one of the following criteria applies:

> (1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
>
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;
>
> (6) The defendant is sentenced for an offense committed while on probation; or
>
> (7) The defendant is sentenced for criminal contempt.

These criteria are stated in the alternative; therefore, only one need exist to support the imposition of consecutive sentencing.

The State argued at sentencing that consecutive sentencing was warranted under criteria (2), (5), and (6).  However, the trial court imposed consecutive sentencing pursuant to criterion (5) alone, finding that the circumstances of the offenses, involving two separate victims who had been raped by their own father, warranted that the rape sentences be served consecutively.  The trial court stated, in pertinent part:

-14-

Count Four though the rape of the other child I'm going to run it consecutive. I don't see how I can give meaning to two separate victims and it certainly comes under the provision of multiple victims and relationships and all of those things that are set forth as one of the reasons why you might run them consecutive so I think the statute allows for it.

On appeal, the defendant cites State v. Hayes, 899 S.W.2d 175, 187 (Tenn. Crim. App. 1995), and State v. James M. Powers, No. E2001-02363-CCA-R3-CD, 2002 WL 31387308 (Tenn. Crim. App. Oct. 23, 2002), perm. to appeal denied (Tenn. Mar. 10, 2003), to argue that there was insufficient proof in the record to support the imposition of consecutive sentencing under criterion (5) of the statute. Specifically, he argues the following: that it is unfair for him to receive consecutive sentences based on his relationship with the victims when he received two separate convictions for incest based on that same relationship; that the offenses for which he was convicted occurred during a single visitation with the children; that his conduct was "not aggravated beyond what is inherent in sex crimes committed against children"; and that there was no evidence that the victims were continuing to suffer any physical or emotional harm from the abuse. The State agues that Hayes and Powers are distinguishable from the case at bar and that the record does not preponderate against the trial court's imposition of consecutive sentencing. We agree with the State.

The defendant in Hayes was convicted of two counts of aggravated sexual battery, based on acts he committed during the summer vacation against his twelve-year-old daughter, and was sentenced by the trial court to consecutive terms of twelve years as a "dangerous offender." 899 S.W.2d at 178, 187. On appeal, the State conceded that the defendant did not qualify as a dangerous offender but, stressing the parent-child relationship between the defendant and the victim, argued that consecutive sentences were warranted under criterion (5) of the consecutive sentencing statute. Id. at 187. This court disagreed, noting that there was no significant time span of undetected sexual activity, the nature of the criminal conduct was nonaggravated, and the extent of residual damage to the victim caused by the conduct was not sufficiently shown. Id.

The defendant in Powers was convicted of four counts of rape of a child based on acts he committed over a several-week period against his eleven-year-old cousin. 2002 WL 31387308, at **1-3. The trial court sentenced him to twenty years for each conviction and, based on criterion (5) of the consecutive sentencing statute, ordered that three of the sentences be served consecutively, for an effective sentence of sixty years in the Department of Correction. On appeal, we concluded that the evidence militated against the application of criterion (5) and modified the sentences to reflect concurrent sentencing for all four convictions. Among the factors this court considered in reaching its decision was that there was no significant time span of undetected sexual activity and "the nature of the criminal conduct was not aggravated beyond what is inherent in sex crimes against children." Id. at *5. The court specifically noted, however, that it was not implying that "all of the aggravating circumstances listed at Tennessee Code Annotated section 40-35-115(b)(5) must be present to support the imposition of consecutive sentencing." Id. at n.4.

The case at bar is distinguishable from both Powers and Hayes. Here, there were two victims, who were only eight and five years old when the abuse occurred. While the acts for which the defendant was convicted occurred during a single visit at his camper, both the defendant and D.S. indicated in their respective statements to investigators that the defendant's sexual abuse of his older daughter had been occurring for a substantial period of time. The victims, according to their mother, still loved their father and were "emotional" about what had occurred. They had begun counseling but were unable to complete it because their mother, at the time the presentence report was prepared, lacked the means to take them to their appointments. We conclude that these factors support the imposition of consecutive sentencing pursuant to Tennessee Code Annotated section 40-35-115(b)(5). We further conclude that the forty-year effective sentence is not excessive given the nature and scope of the offenses. Accordingly, we affirm the trial court's imposition of consecutive sentencing.

### B. Length of Rape Sentences

The defendant also argues that the presumptive twenty-year sentence that the trial court imposed for each rape conviction violates the amendment to Tennessee Code Annotated section 40-35-210(c), as well as the United States Supreme Court's holding in Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004). We respectfully disagree. In State v. Gomez, 163 S.W.3d 632, 661 (Tenn. 2005), our supreme court held that the Blakely decision does not apply to Tennessee sentencing guidelines. Furthermore, the compiler's notes to Tennessee Code Annotated section 40-35-210 (Supp. 2005) expressly state that the amendment to the statute

> shall apply to sentencing for criminal offenses committed on or after June 7, 2005. Offenses committed prior to June 7, 2005, shall be governed by prior law, which shall apply in all respects. However, for defendants who are sentenced after June 7, 2005, for offenses committed on or after July 1, 1982, the defendant may elect to be sentenced under the provisions of the act by executing a waiver of such defendant's ex post facto protections.

As the State points out, both the offenses and the sentencing in this case occurred prior to June 7, 2005. Thus, the trial court did not err in sentencing the defendant to the midpoint in the range for his Class A felonies of child rape. We conclude, therefore, that the defendant is not entitled to relief on the basis of these claims.

### CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE